# In the United States Court of Federal Claims

### No. 14-355C
### (Bid Protest)
### (Filed: August 22, 2014)[1]

* * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| CGI FEDERAL INC., | * | Pre-award Bid Protest; 28 U.S.C. § 1491(b)(1); Jurisdiction; Standing; Prospective Bidder; Direct Economic Interest In Award; Centers for Medicare and Medicaid Services ("CMS"); Federal Acquisition Regulation ("FAR") Part 12; FAR Subpart 8.4; Federal Acquisition Streamlining Act ("FASA"); Customary Commercial Practice; Payment Term; Unduly Restrictive of Competition. |
| Plaintiff, | * | |
| v. | * | |
| THE UNITED STATES, | * | |
| Defendant. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

Scott M. McCaleb, Wiley Rein LLP, 1776 K Street, NW, Washington, D.C. 20006, for Plaintiff. Daniel P. Graham, W. Barron A. Avery, Christine Reynolds, Gary S. Ward, Wiley Rein LLP, 1776 K Street, NW, Washington, D.C. 20006, Of Counsel.

Stuart F. Delery, Robert F. Kirschman, Jr., Kirk Manhardt, and William P. Rayel, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Ben Franklin Station, Washington, D.C. 20044, for Defendant. Jeffri Pierre, Department of Health and Human Services, Office of General Counsel, Of Counsel. Jennifer L. Howard, General Services Administration, Office of General Counsel, Of Counsel.

———————————————————————

## OPINION AND ORDER

———————————————————————

**WILLIAMS**, Judge.

This pre-award bid protest comes before the Court on Defendant's motion to dismiss for lack of standing, Plaintiff's motion for injunctive relief, and the parties' cross-motions for judgment on the Administrative Record ("AR"). Plaintiff, CGI Federal Inc. ("CGI"), challenges the payment terms of three Requests for Quotation ("RFQ") issued by the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services

---

[1] The Court issued this opinion under seal on August 15, 2014, and directed the parties to file proposed redactions by August 22, 2014. The Court publishes this Opinion indicating redactions by brackets "[ ]."

("CMS") for services of Recovery Audit Contractors ("RACs") under the General Services Administration's ("GSA") Federal Supply Schedule ("FSS").[2]

Plaintiff argues that CMS violated the Federal Acquisition Streamlining Act ("FASA") and Part 12 of the Federal Acquisition Regulation ("FAR") by including payment terms in the RFQs that are inconsistent with customary commercial practice. Plaintiff further claims that the payment terms are unduly restrictive of competition. Accordingly, CGI asks this Court to enjoin award of the contracts under these RFQs, order CMS to revise the existing payment terms, and provide all prospective bidders an opportunity to submit bids under the revised RFQs.

Defendant argues that the requirements of FASA and FAR Part 12 do not apply to FAR Subpart 8.4 FSS procurements, and that the payment terms do not unduly restrict competition, pointing to other RACs that bid on the contested RFQs. Finally, Defendant submits that CMS reasonably exercised its discretion even if the payment terms restrict competition.

For the reasons that follow, the Court finds that Plaintiff has standing, but denies the protest.

## Findings of Fact[3]

### The Medicare Fee-for-Service Recovery Audit Program

CMS administers the Medicare Fee-for-Services ("FFS") program and, through a network of contractors, processes more than one billion claims each year submitted by more than one million providers. AR Tab 20f at 533.[4] To insure that paid claims accord with Medicare guidelines, CMS uses Recovery Audit Contractors to identify improper payments and highlight any common billing errors, trends, or other Medicare payment issues. Id. After a pilot program, CMS competitively awarded contracts in 2008 to four RACs—one for each geographical region of the country—including CGI, but performance was delayed due to a bid protest. AR Tab 20f at 533; AR Tab 95 at 8608-10.[5]

---

[2] Specifically, CGI challenges RFQs Numbers:  RFQ-CMS-2014-Region 1, RFQ-CMS-2014-Region 2, and RFQ-CMS-2014-Region 4.

[3] These findings of fact are derived from the AR as supplemented. Additional findings of fact are in the Discussion.

[4] Providers that submit claims include hospitals, physicians, skilled nursing facilities, labs, ambulance companies, and suppliers of durable medical equipment, prosthetics, orthotics, and medical supplies. AR Tab 20f at 533.

[5] The four geographic regions and respective awardees were as follows:  Region A: Performant Recovery (formerly Diversified Collection Services, Inc.); Region B:  CGI; Region C:  Connolly; Region D:  Health Data Insights ("HDI"). AR Tab 95 at 8609; AR Tab 111 at 9085; AR Tab 128 at 9547; AR Tab 147 at 9967. The AR contains a map of the country by region. AR Tab 20f at 537.

The RAC program has successfully assisted CMS in recouping improper Medicare payments.  In the 2011 fiscal year alone, RACs identified 887,291 improper payments, resulting in corrections totaling $939.3 million.  AR Tab 20f at 533.  "After taking into consideration all fees, costs, and appeals, the Medicare FFS Recovery Audit Program returned $488.2 million to the Medicare Trust Fund" in 2011.  Id.  That same year, providers appealed 6.7% of identified overpayments, but less than half of that 6.7% were successful at some level of the appeal process.  Id. at 567.

Each RAC reviews the Medicare FFS claim payments processed in its region to identify improper payments.[6]  CMS pays the RACs on a contingency fee basis calculated as a percentage of the improper payment.  AR Tab 20f at 537.  When a RAC identifies an improper payment, CMS, through a contractor, sends the provider a demand letter that in the case of an overpayment requests repayment in a specific amount.  Id. at 538.  The demand letter also contains the rationale provided by the RAC "includ[ing] references utilized in reviewing the medical documents, and . . . educat[ing] providers about how to avoid similar payment errors in future Medicare billing practices."  Id.[7]  CMS' recoupment of an overpayment typically commences within 41 days of the demand letter.  Id. at 539.

**The Appeal Process**

If a provider disagrees with the RAC's determination that CMS overpaid the provider, the provider can appeal.  There are five levels of appeal.  See id. at 539.

The First Level of Appeal: "Redetermination"

After receiving a demand letter that identified an overpayment, regardless of the amount in controversy, a provider can appeal by seeking a redetermination as to the propriety of the identified payment.  Id. at 539-40; see also 42 C.F.R §§ 405.940-42.  This "first level appeal" must be requested, in writing, within 120 days of receiving the demand letter.  42 C.F.R §§ 405.942(a), 405.944(b).  The provider must explain the basis for its disagreement with the determination and may submit any relevant evidence.  Id. at § 405.946(a).  A written decision will be rendered within 60 days of receipt of the provider's request for a redetermination and must inform the provider of its right to appeal and the procedures for seeking a redetermination.  Id. at §§ 405.950(a), 405.956(b)(5).

---

[6] Improper payments include overpayments by CMS to a provider.  An overpayment can occur when the review of the medical records shows that an item or service is not covered under Medicare or Medicaid, was not medically necessary, was improperly coded, or lacks proper supporting documentation.  Id. at 535-36.  Because of the great volume of claims, CMS must pay the claims before reviewing the medical records.  Id. at 536.

[7] While CMS transitioned this responsibility to Medicare Administrative Contractors ("MACs") in the 2011 fiscal year, RACs are responsible for providing an explanation for their identified overpayments.  Id. at 538-40.

The Second Level of Appeal: "Reconsideration at the QIC Level"

If a provider disagrees with the redetermination, it can appeal to a qualified independent contractor ("QIC") within 180 days of its receipt of the redetermination letter.  AR Tab 20f at 539; 42 C.F.R § 405.962(a).   In CMS parlance, this level of appeal is referred to as "reconsideration," "the QIC level," and "the second level" interchangeably.  The QIC reviews the evidence and findings upon which the initial determination and the redetermination were based, as well as any additional evidence a provider submits or that the QIC obtains independently.  42 C.F.R. § 405.968(a)(1).  QICs must process the provider's appeal within 60 days.  Id. at § 405.970(a).

The Third Level of Appeal: A Hearing Before An Administrative Law Judge ("ALJ")

If the provider is dissatisfied with the QIC's reconsideration, or if the QIC did not timely process the provider's request, the provider may request a hearing with an Administrative Law Judge ("ALJ") if the claim meets the amount-in-controversy threshold.[8]  Id. at §§ 405.1000(a), 405.1006.  The provider must file within 60 calendar days of receipt of the notice of the QIC's reconsideration.  Id. at § 405.1002(a)(1).  "The ALJ conducts a *de novo* review and issues a decision based on the hearing record."  Id. at § 405.1000(d).  The ALJ must issue a decision, dismissal order, or remand to the QIC, within 90 days if the provider appealed the QIC's decision or within 180 days if the provider requested an ALJ hearing because the QIC failed to issue a decision within the prescribed time period.  Id. at § 405.1016.

The Fourth Level of Appeal: Medicare Appeals Council ("MAC") Review

The provider may appeal the ALJ's decision to the Medicare Appeals Council.  Id. at § 405.1102(a)(1).  The MAC conducts a *de novo* review and must issue a final decision, dismissal order, or remand, within 90 calendar days of receipt of the provider's request.  Id. at § 405.1100(c)-(d).

The Fifth Level of Appeal: United States District Court Review

If the provider remains dissatisfied and the amount in controversy is at least $1,300[9] it may file an appeal of the MAC's decision within 60 days to a United States District Court.  Id. at §§ 405.1006(c)(1), 405.1130.  The District Court is not subject to a time limit to make this final, binding, decision.

**The Original RAC Contracts**

The original RAC contracts, signed in late 2008, contained the following payment terms:

---

[8] This amount was $130 in 2011, according to CMS' Report to Congress.  AR Tab 20f at 539.

[9] This amount was $1,300 in 2011, according to CMS' Report to Congress.  Id.

All payments shall be paid only on a contingency fee basis.   The contingency fees shall be paid once the recovery audit contractor collects the Medicare overpayment.   The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments.   If, during the period of performance of this contract, the RAC determination is overturned at any level of appeal the recovery audit contractor shall repay Medicare the contingency payment for that recovery.

AR Tab 95 at 8608-10.[10]   Under these terms, RACs typically invoiced CMS at the time of collection of the overpayment, at least 41 days after the demand later.  AR Tab 20c at 473-74.

## The February 2013 RFQs

On February 28, 2013, CMS issued an RFQ pursuant to GSA's Financial and Business Solutions ("FABS") Schedule seeking to award five task orders to Recovery Audit Contractors— four for Medicare/Medicaid in different regions and one relating to durable medical equipment ("DME") and Home Health/Hospice Recovery.  AR Tab 47 at 1542-1735.  This RFQ contained identical payment terms to the original RAC contracts.  Id. at 1645-46; AR Tab 95 at 8610.

This payment clause provided:

If an incumbent Recovery Auditor . . . is awarded a new contract in any region, all outstanding receivables, claim adjustments, discussion periods, and appeals will transition and continue to be the responsibility of the Recovery Auditor who identified the improper payment.  If a new Recovery Auditor . . . is awarded a contract all outstanding receivables in the region without an incumbent Recovery Auditor will transition to the new Recovery Auditor.  The new Recovery Auditor will then be responsible to complete any remaining appeal workload but will not lose the contingency fee for overturned appeals that they did not identify.

AR Tab 47 at 1609.  Seven bidders, CGI, HealthDataInsights, Inc., Connolly, Inc. ("Connelly"), Performant Financial Corporation ("Performant"), PRGX Global, Inc. ("PRGX"), Catapult Consulting, LLC ("Catapult"), and AdvancedPharmacyConcepts ("APC"), submitted quotes in response to this RFQ.  AR Tab 57 at 1991-98.

## Health Data Insights' Pre-Award GAO Protest and CMS' Corrective Action

On April 3, 2013, HealthDataInsights ("HDI"), an incumbent RAC, filed a pre-award bid protest at the GAO alleging that the February 2013 RFQ imposed a different scope of work and lacked sufficient information for bidders to submit an informed price.  AR Tab 56 at 1976-88. CMS took corrective action and cancelled the RFQ.  AR Tab 22c at 631; AR Tab 58-59 at 1999-2001.  As a rationale for this cancellation, the Government stated that the February 2013 "RFQ did not address how the RACs would repay [the] contingency fees if collected overpayments

---

[10] The Court cites the RFQ for Region 4.  The RFQs for Regions 1 and 2 are essentially the same.

were returned on appeal after the expiration of the contract." AR Tab 47 at 1646; AR Tab 95 at 8610; AR Tab 111 at 9089; AR Tab 128 at 9551; AR Tab 147 at 9971.

In an undated internal memo that the Government did not produce at the GAO, an unidentified author at CMS discussed a perceived problem with the original payment terms, stating:

> The problem is provided in the contract itself stating that CMS will collect during the period of performance of the contract. Appeals can take up to two years on recoveries made by the RAC causing the concern that CMS will not receive reimbursement due to the language in the contract. In discovery of this issue, CMS, OFM, OGC and [RACs] have thoroughly reviewed this issue and came up with a plan to move forward. (Please see attached draft mod language). Below are options that came up during discussions with all parties aforementioned:
>
> - Surety Bond
> - Withhold
> - Trust fund
> - Escrow
> - Progress Payments
> - Letter of Credit
> - Financial rewards
> - Letter of Assurance from Parent Company
> - Reserve
>
> Decision:  After extensive review, CMS' plan is to extend the current contracts for an additional 2 years for administrative purposes and have each RAC record/set aside an appeal reserve sufficient for potential contractual liabilities in the event that overpayment decisions are overturned on appeal. The appeal reserve shall be based on the RACs historical contract-to-date appeal and loss rates for invoiced overpayment claims. The appeal reserve shall be reviewed and updated monthly to ensure that it remains adequate to cover any potential liability and shall remain through the contract ending date of December 31, 2015 or later if further extended through contract modification. The RAC is responsible to reimburse CMS for all monies due to CMS on appeals that are adjudicated in the providers favor even if such amounts exceed the reserve set aside.  In addition, the RAC shall provide a letter of assurance from its parent company stating that should the RAC be unable to reimburse CMS monies due on overturned appeals, that it would assume the responsibility to reimburse CMS.

AR Tab 59 at 2000.  The memo continued:

> During the protest, [

].  With this drastic change on how the [RAC] gets paid[,] Offeror's would have proposed differently.  With the highlighted issues above, CMS plans to do the following:

- Cancel procurement
- Pay after the second level of appeals (QIC)
- Change evaluation criteria from LPRA to Tradeoff.

Id. at 2001.

In light of HDI's pre-award protest, CMS extended the original RAC contracts to continue services while it planned the next RFQ.  AR Tab 22c at 631; AR Tab 58 at 1999; AR Tab 110 at 8673; AR Tab 110 at 9021; AR Tab 111 at 9094; AR Tab 127 at 9483; AR Tab 128 at 9556; AR Tab 146 at 9903; AR Tab 147 at 9976; AR Tab 160 at 10376; Def.'s Mot. App. 12-19.

On June 25, 2013, CMS provided RACs with a draft modification of incumbent contracts that contained terms requiring the RACs to wait to invoice until the improperly paid claims had exited the second level of appeals process, i.e. the QIC level.  AR Tab 161 at 10462, 10511.  Specifically these payment terms stated:

> Effective the date of this contract modification, Recovery Auditors shall not receive any contingency fee until the improperly paid claims have exited the second level of the appeals process (QIC level).  If no appeal has been filed within the initial 120 days that a provider has to appeal, Recovery Auditors may then invoice for their contingency fee payment.  There are specific statutory timeframes for filing an appeal after a decision at each level.  If no additional appeal is submitted within that timeframe, the claim may be invoiced for payment.

Id. (emphasis added).  All four incumbent RACs rejected these proposed modifications, and negotiations ensued.  E.g., id. at 10547-50, 10770-73, 10934-36, 10942-43.  Each RAC complained that this was a dramatic change and they could not agree without increasing their fees.  Id.  Ultimately, all RACS ended up refusing to sign the modification as proposed by CMS.  See id.

After negotiations, the incumbent RACs entered into contract modifications.  CGI signed its contract modification on July 31, 2013.  AR Tab 110 at 9021.  The payment terms of CGI's modification stated:

> **Section B.3 CONTINGENCY FEE,** is hereby modified to revise the payment methodology scale percentages, Section B.3 is replaced in its entirety and reads as follows:
>
> a.  All payments shall be paid only on a contingency fee basis.  The contingency fees shall be paid once the recovery audit contractor collects

the Medicare overpayment. The recovery audit contractor shall not receive any payments for the identification of the underpayments or overpayments. If the RAC determination is overturned at any level of appeal[,] the recovery audit contractor shall repay Medicare the contingency payment for that recovery.

Id. at 9022.

In addition to changing the contingency fee payment terms, the modification extended the contract term, required RACs to create a reserve fund so that RACs could repay CMS their contingency fees if an overpayment was overturned on appeal, required RACs to provide a letter of guarantee from their parent companies agreeing to reimburse contingency fees for overpayments reversed on appeal, and increased the contingency fee CMS would pay to the RACs. AR Tab 110 at 9021-25; AR Tab 127 at 9483-87; AR Tab 146 at 9903-07; AR Tab 160 at 10376-80.

In an undated memo[11] CMS cancelled the February 2013 RFQ. AR Tab 22c at 631; AR Tab 58 at 1999-2001. CMS explained that "[i]n the course of undertaking corrective action" responsive to HDI's pre-award protest, "CMS made several significant changes to the RFQ[;] the most significant change is when the RAC contractor will receive payment." AR Tab 22c at 631. The memo further acknowledged that these "major revisions" are "so substantial that they exceed what prospective Offerors reasonably could have anticipated." Id. As such, the contracting officer determined that it would be in the best interest of the Government to cancel the February 2013 RFQ and release new RFQs for RAC services. Id.

**The January 2014 RFQs**

In January 2014, CMS issued four RFQs for RAC services in four regions for Medicare Parts A and B pursuant to GSA's Financial and Business Solutions Schedule. AR Tab 62 at 2083; AR Tab 74 at 4393; AR Tab 84 at 6666. These RFQs contained virtually the same terms as CMS' proposed contract modification in June 25, 2013, namely that the RACs were required to wait to invoice until the alleged improper claims cleared the second level of appeal—QIC level—i.e., 80 days longer than RACs had to wait under the original contracts. AR Tab 62 at 2086; AR Tab 74 at 4396; AR Tab 84 at 6669. Specifically, the payment terms in the January 2014 RFQs state:

Recovery Auditors shall not receive any payments from the mere identification of improper overpayments. Recovery Auditors may invoice for the applicable contingency fees when all required claim elements are input into the Data Warehouse and the improperly paid claims have exited the second level of the appeals process (QIC level). There are specific statutory timeframes for filing appeals at each level. If no appeal has been filed within the initial 120 days that a provider has to appeal, Recovery Auditors may then invoice for their contingency

_____
[11] The memo cancelling the procurement is not dated, though the digital signature of the contracting officer contains the date of the e-signature, which was December 6, 2013.

fee payment. If no additional appeal is submitted within the required timeframe, the claim may be invoiced for payment.

Id. (emphasis in original). Per these terms, if an appeal were granted by QIC, then the RAC must wait even longer to invoice—up to 420 days. AR Tab 21d at 580-81; AR Tab 22b at 614; AR Tab 94 at 8603. CMS articulated the following rationale for this change in payment terms:

> The bottom line concern is the RACs really should not be paid until it is determined that the recoupment is deemed legitimate and appropriate (after the appeals process). We felt that after the 2nd level, CMS could be substantially confident that the overpayment would be upheld. Meaning, [if] the provider lost the first and 2nd appeal, it would likely [be] that the provider would still lose at the [Administrative Law Judge level]. But, since the [Administrative Law Judge level] takes so long (could be up to 2 years or longer), it seemed unreasonable to have the RAC wait for payment. However, if the provider wins at [Administrative Law Judge level], the RAC must still pay CMS back. Timeframes for appeals are as follows:

> 1st Level: providers have up to 120 days to file an appeal - decided [within] 60 days
> 2nd Level: providers have up to 180 days after the 1st level decision - decided [within] 60 days

AR Tab 94 at 8603 (internal CMS email dated January 31, 2014 that CMS did not produce during the GAO proceeding).[12]

**The Modified Payment Terms Deviate from Standard Commercial Practice**

Under standard commercial practice in the recovery audit industry, a RAC invoices its commission payment immediately after the payer recoups the improperly paid claim. AR Tab 32 at 1292, 1295. As CGI's Vice-President of Health Compliance, Robert Rolf, explained:

> It is standard practice in the recovery audit industry for audit vendors to invoice immediately after the payer recoups an improper payment. Recoupment occurs when the overpayment is identified, the payer adjusts the improperly paid claim in its system, and debits the overpayment against future payments to the provider. Typically, recoupment will occur between 30-60 days after the overpayment is identified, depending on the payers' internal processes. If the provider disagrees that the claim was improperly paid, that process may take up to 30 days longer.

\* \* \*

---

[12] This email was first produced as part of the AR before this Court and was not part of the record before the GAO.

> [W]hen and if an overpayment is successfully challenged by a provider after recoupment, the payer simply returns the recouped funds to the provider and automatically deducts the RAC's commission from the RAC's next invoice.

<u>Id.</u> at 1292 ¶ 5, 1293 ¶ 9.[13]   In keeping with industry practice, all of CGI's recovery audit contracts permit CGI to invoice immediately after the payer recoups payment.  <u>Id.</u> at 1293 ¶ 9.

Highmark Inc. ("Highmark"), the fourth-largest Blue Cross and Blue Shield affiliate and a Pittsburgh-based company providing 33.5 million people with health insurance, dental insurance, vision care, and information technology, utilizes RACs to recoup approximately $[ ] million annually from health care service providers.  <u>Id.</u> at 1295 ¶¶ 2, 3.   In keeping with industry practice, a recovery audit vendor is entitled to immediately invoice Highmark for its commission payment once the improperly paid claim is adjusted downward and the overpayment deducted from Highmark's next payment to the provider.  <u>Id.</u> at 1295 ¶ 4.   The vendor immediately invoices Highmark after the claim is adjusted regardless of whether the provider agrees that the claim was paid properly.  <u>Id.</u> at 1296 ¶ 6.  "Adjustment is usually delayed no more than 30-40 days by a provider's disagreement that a claim was improperly paid."  <u>Id.</u>  Vince Garofalo, a fraud consultant for Highmark who supervises Highmark's four recovery audit vendors, testified in a declaration:

> I am not aware of any commercial recovery audit programs that require a vendor to wait 120 days or more following adjustment of a claim.  I am not aware of [a] business purpose that could be served by requiring a vendor to withhold an invoice after an adjustment has been made and Highmark has taken the steps necessary to recoup the overpayment.

<u>Id.</u> at 1296 ¶ 7.[14]

### CGI and HDI's Pre-Award GAO Protests Challenging the January 2014 RFQs

Before the close of bidding, CGI and HDI filed pre-award bid protests at the GAO, claiming that, contrary to FAR Part 12, the payment terms were inconsistent with customary

---

[13] Mr. Rolf is responsible for CGI's recovery audit programs, data analysis services, fraud and abuse detection, and management services, including CGI's recovery audit work for commercial health payers, <u>e.g.</u>, [

], CMS and state Medicaid recovery programs, <u>e.g.</u>, Medicaid recovery audit contracts for Ohio, Massachusetts, Washington, and Colorado.  AR Tab 32 at 1292 ¶¶ 2, 3, 4.  Mr. Rolf has 18 years experience in public and private recovery audit programs, eight of which were in managing RAC programs, and has briefed executive agency personnel and members of Congress and testified before legislative committees on recovery audits and improper payment issues.  <u>Id.</u> at 1292 ¶ 1.

[14] Mr. Garofalo has worked as a fraud consultant for Highmark since 1997, overseeing the recovery of Highmark overpayments to health care providers.  <u>Id.</u> at 1295 ¶ 3.

commercial practice, unduly restrictive of competition, and violated the recovery audit program's enabling statute as well as prompt payment requirements.  AR Tab 44 at 1414-15.  In an internal email discussing these bid protests, CMS again examined the effects of changing the payment terms:

> So far we have 3 pre-award protests from the RACs (2 from HDI and now one from CGI).  All three are protesting the payment process.  If you recall, [
>
> ].  In working with OFM, we determined that it would be in the Gov't best interest to [make] payment after 2nd level appeal (QIC Level).  The original RAC program allowed the RACs to get paid after recoupment – which could be prior [to] any appeal process.  The RACs are not happy because it will increase the time period in which they will get paid.  However, keep in mind that [
>
>
>
> ].

AR Tab 94 at 8607.3.[15]

While HDI's and CGI's protests were pending at the GAO, Connolly, Performant, HDI, PRGX, and Sagebrush Solutions submitted timely quotes in response to the January 2014 RFQs.  AR Tab 65 at 2262-64; AR Tab 77 at 4528-31; AR Tab 87 at 6845-48.  PRGX later withdrew its quote.  AR Tab 41 at 1337; AR Tab 71 at 4314; AR Tab 82 at 6588; AR Tab 93 at 8584.  CGI did not submit a quote for the January 2014 RFQs, but awaited the decision of its pre-award protest then pending at the GAO.  AR Tab 44 at 1410; AR Tab 65 at 4528-31; AR Tab 87 at 6845-47; see AR Tab 65 at 2262-64.

On April 23, 2014, the GAO denied CGI's and HDI's bid protests.  AR Tab 44 at 1410.  Though the GAO recognized that "the RFQs require the RACs to wait a minimum of 120 days and no more than 420 days before they could invoice for their contingency fee," it noted that this 120-day period—representing the expiration of the time a provider may appeal—is only 80 days longer than the RACs must wait under their existing contracts.  The GAO also pointed out that historical data shows that providers only appeal 5.8% of the overpayment determinations and, from there, only appeal the first level redetermination in 0.84% of total cases, hence the RACs would wait longer than 120 days in only approximately 6% of cases.[16]  Addressing the protesters' contention that the payment terms are unduly restrictive of competition, the GAO

---

[15] This email was not part of the record before the GAO.

[16] In a footnote, the GAO stated:  "Providers sought a redetermination in 52,422 cases and requested a reconsideration in 7,561 cases in fiscal year 2011.  Of those, 741 overpayment determinations were appealed to an administrative law judge (third-level appeal)."  AR Tab 44 at 1418 n.18 (internal citations omitted) (citing the fiscal year 2011 report to Congress in the GAO).

held that the terms are "necessary to address situations where a RAC has to reimburse CMS for an overpayment determination that is overturned on appeal after the contract period of performance has ended." Id. at 1414.  The GAO further held that "FAR Part 12 procedures do not apply to orders being placed against the FSS," but acknowledged that FAR Part 12 does apply to GSA's initial award of a vendor's master schedule contract and to orders where an agency adds open market items not listed on the master schedule contract.  AR Tab 44 at 1415.

On April 28, 2014, five days after GAO's denial, CGI filed the instant protest.[17]

## Discussion

## Jurisdiction

The Tucker Act authorizes this Court to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract, or to a proposed award . . . or any alleged violation of statute or regulation in connection with a Federal procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2012).  Jurisdiction is a threshold issue that the Court must address before examining the merits.  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  In "reviewing a motion to dismiss for lack of subject matter jurisdiction, a court accepts only uncontroverted factual allegations as true for purposes of the motion."  Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014) (citing Gibbs v. Buck, 307 U.S. 66, 72 (1939)); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  If the motion to dismiss challenges the underlying jurisdictional facts as alleged, then the court "may consider relevant evidence in order to resolve the factual dispute."  Banks, 741 F.3d at 1277 (citing Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988)).  "Standing is a question of subject matter jurisdiction . . . ."  Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013) (citing S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1328 n.3 (Fed. Cir. 2005)).

## CGI Has Standing

The Government contends that CGI lacks standing because it is not an interested party as it was not prevented from bidding and cannot demonstrate a direct economic impact affected by award.  Plaintiff "bears the burden of establishing [the] elements [of standing]" because it invokes this Court's jurisdiction.  Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (alterations in original) (quoting Lujan, 504 U.S. at 561).  To have standing in a bid protest, a protestor must be an "interested party."  Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citing Rex Serv. Corp. v. United States, 448 F.3d

---

[17] At the Court of Federal Claims, CGI added an assertion that FASA requires payment terms consistent with standard commercial practice and dropped a claim made before the GAO that the modified terms violated prompt payment terms in 5 C.F.R. §1315.4(e) (2014) which prohibits extended acceptance periods.  See id.

HDI did not protest in this Court.

1305, 1307 (Fed. Cir. 2006)).  To be an "interested party," a protestor must show:  (1) that it is an "actual or prospective bidder" (2) "whose direct economic interest would be affected by the award of the contract."  Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (citing Rex, 448 F.3d at 1307).  As the term denotes, an actual bidder is one who submitted a bid for the challenged procurement.  Rex, 448 F.3d at 1307.  A prospective bidder "must be expecting to submit an offer prior to the closing date of the solicitation."  Id. at 1308 (Fed. Cir. 2006) (citing MCI Telecommunications Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989)).

## CGI Is A Prospective Bidder

Invoking Rex Services Corporation v. United States, the Government argues that CGI cannot be a prospective bidder because "the opportunity to qualify as either an actual or prospective bidder ends when the proposal period ends" and CGI "could have bid, but chose not to, [and therefore] cannot be considered a prospective [bidder]."  448 F.3d at 1308 (quoting MCI, 878 F.2d at 365).  Although Rex was a post-award protest, it addressed generally the requirements to be a prospective bidder, and the Federal Circuit has applied Rex to the pre-award context.  Orion, 704 F.3d at 1348-49.

The plaintiff in Rex was an incumbent and the only approved source for the items being solicited by the Defense Supply Center ("DSC")—thumbwheel switches.  One day before the close of bidding, Rex filed an agency protest asserting violations of the Procurement Integrity Act ("PIA"), namely that the RFP disclosed some of its proprietary information, but did not allege that such violations prevented it from bidding.  Rex, 448 F.3d at 1306-07.  Rex did not submit a bid before the close of bidding.  After losing the agency protest, Rex did not file a pre-award protest in any other forum.  Three months after losing the protest and almost a month after the agency made award, Rex filed a protest in the Court of Federal Claims contending that the agency "deviated from the process specified in the 2004 RFP."  Id. at 1307.  Hence, Rex attempted to protest the agency's evaluation in a procurement where it did not bid.  Rex's pre-award protest against disclosure of its proprietary information in the RFP had nothing to do with its post-award challenge to the evaluation in a competition it never entered.

The Federal Circuit in Rex found that the plaintiff lacked standing because it neither bid nor "file[d] a timely bid protest in the Court of Federal Claims, in which it established that it expected to bid prior to the close of the solicitation period but was prevented from doing so on the basis of improper agency action."  Id. at 1308 (citing MCI, 878 F.2d at 365).  The plaintiff in Rex clearly lacked standing as it was neither an actual nor a prospective bidder.  As the Federal Circuit explained:  "It is not relevant to Rex's status that it filed a pre-award agency protest, or that it alleges department 'illegalities' prejudiced its ability to bid.  It 'could have [bid] for the contract award . . . and could have utilized the protest procedures available to an interested party to correct [the] deficiencies it perceived in the procurement process.'"  Id. at 1308 (alterations in original) (quoting Fed. Data Corp. v. United States, 911 F.2d 699, 705 (Fed. Cir. 1990)).

In Rex the Federal Circuit expressly declined to reach a similar scenario to that presented here, explaining that it did "not decide, whether an agency protest, filed before the end of the solicitation period, that establishes the party expected to bid, but was prevented from doing so by

improper agency action, may meet the requirements of <u>MCI</u> and secure prospective party status for a subsequent bid protest action." <u>Id.</u> at 1308 n.**.  As such, this Court is confronted with an issue the <u>Rex</u> court did not reach—whether CGI, in filing a GAO protest before the end of the bidding period, established that it "expected to bid but was prevented from doing so by improper agency action" and achieved "prospective bidder status."  <u>Id.</u>

CGI has consistently maintained that the alleged improper agency action—inclusion of the modified payment terms—prevented it from bidding by delaying its ability to invoice, thereby so restricting its cash flow as to make any resultant contract commercially impracticable. Absent this restriction, CGI, a successful incumbent, expected to bid and would have bid.  As CGI's Vice President of Health Compliance, Robert Rolf, testified:

> [T]he new RFQ payment terms will require CGI to quickly absorb [accounts receivable] balances in excess of $[ ] million, whereas the current payment terms have imposed an AR balance that is [        ] of that amount over the life of the contract.

AR Tab 32 at 1294 (Rolf Decl. ¶ 14, Mar. 13, 2014).  Mr. Rolf continued:

> CGI is an established RAC and is well-positioned to perform on recovery audit contracts containing customary commercial payment terms.  The RFQs' payment terms add an additional, significant cost burden to CGI that unfairly and unnecessarily restricts CGI's overall cash flow.  As a publicly traded company, such terms are simply unacceptable and render the RAC business commercially impracticable.  In that case, CGI will have no choice but to not participate in these procurements.

<u>Id.</u> at ¶ 15.

Mr. Rolf's testimony establishes that, but for the modified payment terms, CGI expected to submit a bid prior to the closing date of the RFQs.  In arguing that CGI does not qualify as a prospective bidder because it could have submitted a quote but chose not to, Defendant would have this Court discredit Mr. Rolf's unrebutted testimony and substitute its speculation on what CGI "could have" bid.  Defendant argues that Plaintiff had a reasonable opportunity to bid under the modified payment term because, even with the required delay in invoicing, Plaintiff could still have submitted a profitable bid.  However, CGI's Vice President's testimony that CGI could not bid under the modified payment term is unrebutted and reflects the unremarkable observation that the delay in invoicing dictated by the modified term would result in a substantially increased accounts receivable balance, causing cash flow problems.

Defendant argues that because CGI's present contingency fee percentage is approximately [ ]% and the FSS contract permits this percentage to be as high as 19.55, CGI could have raised its rate and submitted a quote.  Def.'s Mot. 20.  Similarly, in addressing the difficulty with cash flow, the Government concedes that there is a "cost" to borrowing money, but argues that financing would not have been difficult for CGI to obtain, given its available credit and its parent companies' financial statements.  There is, however, no basis for this Court

to cast aside Mr. Rolf's testimony and substitute the Government's speculation as to what a successful and sophisticated contractor could have bid.

The Government also argues that filing a timely pre-award protest in another forum does not "preserve[] a plaintiff's prospective bidder status, where the deadline for submitting quotes passes prior to the Plaintiff filing a protest in this Court." Def.'s Opp'n 5. CGI established that it was a prospective bidder before the close of bidding by filing a GAO protest which fully put the agency on notice of what it claimed was improper agency action in the RFQs. Then CGI pursued its protest by filing in this Court immediately upon the GAO's denial of its protest. Unlike the plaintiff in Rex who waited until after award to protest on grounds different than it had raised pre-award at the agency, CGI continued to "utilize[] the protest procedures available to an interested party to correct [the] deficiencies it perceived in the procurement process." Rex, 448 F.3d at 1308 (alteration in original) (quoting Fed. Data Corp., 911 F.2d at 705).

Defendant appears to be saying that CGI's protest at the GAO did not count toward preserving its prospective bidder status for a protest in this forum. This Court disagrees. Pre-award protests in any forum serve the salutary purpose of permitting an agency to correct errors in a solicitation and proceed with its procurement. It matters not what forum a plaintiff chooses to notify the agency that its solicitation is infirm—an agency protest provides just as effective a remedial vehicle as a protest brought at the GAO, or this Court.

As this Court ruled in Bannum Inc. v. United States, 115 Fed. Cl. 257, 274 (2014), even a letter that does not constitute a formal agency protest can suffice to adequately notify the agency of a pre-award objection to a solicitation. This Court in Bannum reasoned:

> Defendant and Intervenor interpret the Blue & Gold waiver rule to require a protestor to pursue a formal pre-award protest with the agency, GAO or this Court. Neither Blue & Gold nor COMINT however stands for the proposition that a protestor must file a formal protest to preserve its right to challenge a solicitation. In articulating the waiver rule and confirming its broad application in bid protests, the Federal Circuit only required that a protestor "object to" or "challenge" a solicitation containing a patent ambiguity or error before award. Blue & Gold, 492 F.3d at 1315; COMINT, 700 F.3d at 1382. The Federal Circuit did not articulate any specific procedural requirements for such a challenge or objection or suggest that a protestor would have to pursue a formal protest remedy pre-award. The point of the waiver rule is to provide notice to the agency so that it can remedy a defective solicitation before award. Allowing informal notice in raising pre-award issues permits the expeditious amendment of problematic solicitations or, if the agency is satisfied its solicitation is adequate, an expeditious continuation with the award process at hand. At present, the law does not require that Bannum do anything more than it did here. All that is required is that a protestor must have "done something" to challenge a solicitation prior to award to preserve its right to protest the solicitation in this Court. DGR Assocs., Inc. v. United States, 94 Fed. Cl. 189, 202-04 (2010) ("All [Blue & Gold] says is that a party must have done something prior to the closing date to protest the solicitation

error, before raising 'the same objection . . . subsequently in the Court of Federal Claims.'" (quoting Blue & Gold, 492 F.3d at 1313)).

115 Fed. Cl. at 274; see U.S. Foodservice, Inc. v. United States, 100 Fed. Cl. 659, 673 (2011).

In sum, this Court finds that because CGI was a qualified bidder, expected to bid, would have bid but for the unacceptable payment term and timely challenged this term prior to the close of bidding, CGI has demonstrated that it is a prospective bidder.

## CGI Has a Direct Economic Interest That Would Be Affected By Award

To establish standing, CGI must also demonstrate that it has a "direct economic interest [that] would be affected by the award of the contract." Digitalis, 664 F.3d at 1384 (citing Rex, 448 F.3d at 1307). The Federal Circuit has stated that "[g]enerally, to prove the existence of a direct economic interest, a party must show that it had a 'substantial chance' of winning the contract." Orion, 704 F.3d at 1348 (citing Rex, 448 F.3d at 1308). There is, however, "an exception to that standard [] when a prospective bidder challenges the terms of the solicitation itself, prior to actually submitting a bid." Id. (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1361 (Fed. Cir. 2009)). In the pre-award context, the protestor can establish a direct economic interest "by demonstrating that it suffered a 'non-trivial competitive injury which can be redressed by judicial relief.'" Id. (citing Weeks Marine, 575 F.3d at 1361-62).

In fashioning this less exacting standard for establishing a direct economic interest in a pre-award protest, the Federal Circuit explained:

> We have not had occasion to discuss what is required to prove an economic interest, and thus prejudice, in a case such as this, where a prospective bidder / offeror is challenging a solicitation in the pre-award context. In such a case, it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award bid protest cases. See, e.g., Statistica, 102 F.3d at 1582 (holding that a contractor lacked standing because it failed to show a "substantial chance it would have received the contract award but for" agency error). The reason of course is that, in a case such as this, there have been neither bids/offers, nor a contract award. Hence, there is no factual foundation for a "but for" prejudice analysis. However, Article III considerations require a party such as Weeks to make a showing of *some* prejudice. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("First, the plaintiff must have suffered an 'injury in fact'. . . "); Myers Investigative & Sec. Servs., 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing.").

* * *

> Upon consideration of the matter, we conclude that the standard applied by the Court of Federal Claims ["a non-trivial competitive injury which can be redressed by judicial relief -- ] "strikes the appropriate balance between the language of §

1491(b)(1), which contemplates" an action by an interested party objecting to a solicitation for bids or proposals . . .  or any alleged violation of statue or regulation in connection with . . .  a proposed procurement," and Article III standing requirements.

Weeks Marine, 575 F.3d at 1361-63.

The Government contends that CGI has not demonstrated a non-trivial competitive injury, because it lacked the requisite financial resources to be a qualified bidder.  Specifically, the Government states that if CGI has concerns about waiting an additional 80 days for payments, then it would not be able to demonstrate adequate financial resources to satisfy the RFQ requirement that RACs be capable of sustaining operations without payment for a year.  In making this argument, the Government is jumping the gun—evaluating CGI's hypothetical compliance with the RFQs and attempting to make a nonresponsibility determination for the purposes of litigation without a contracting officer doing the analysis.  The Government's attack on CGI's financial capability is predicated on speculation, not on a sufficiently developed record. CGI was a qualified bidder that had successfully performed the services being procured, but the prompt payment clause that CGI claims is illegal prevented it from submitting a viable bid. Here, as in Weeks Marine, Inv. v. United States, CGI had "a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations."  575 F.3d at 1362.  As such, CGI has demonstrated a nontrivial competitive injury which can be redressed by this Court.

## CGI Did Not Waive its Standing Argument

Defendant contends that CGI has waived any argument on standing because it failed to address the issue in its opening brief for judgment on the AR.  Defendant cites Novosteel SA v. United States, 284 F.3d 1261, 1273 (Fed. Cir. 2002) and Brooks Range Contract Services v. United States, 101 Fed. Cl. 699, 708 (2011) for the principle that a plaintiff must raise standing in its opening brief to avoid waiver and that pleading standing in a complaint is not sufficient. Tr. Oral Arg. 32, June 6, 2014.  Novosteel is inapposite as it involves waiver of a retroactivity argument in an anti-dumping case and does not suggest that a jurisdictional argument like standing can be waived.

Brooks Range is not binding, and to the extent Brooks Range could be applied here, this Court declines to follow it.  Standing is not the type of argument that can be waived because Plaintiff failed to mention it in an opening brief.  Rather, because standing is jurisdictional, argument on that issue may be made at any time, especially since standing may be raised on appeal or by the Court sua sponte.  Weeks Marine 575 F.3d at 1358-59; Myers, 275 F.3d at 1369; Fuji Photo Film Co. v. Int'l Trade Comm'n, 474 F.3d 1281, 1289 (Fed. Cir. 2007); Bannum, 115 Fed. Cl. at 153; Archura, 112 Fed. Cl. at 497.

## Standard of Review for Bid Protests

The Court evaluates bid protests pursuant to the Administrative Procedure Act's standard of review for an agency action.  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir.

2005) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Therefore, this Court will not disturb an agency's procurement decision unless the Court finds that it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012); Adams & Assocs. v. United States, 741 F.3d 102, 105-06 (Fed. Cir. 2014).  Under Rule 52.1, the parties are limited to the AR and the Court makes findings of fact as if it were conducting a trial on a paper record.  See Bannum, 404 F.3d at 1356.  Looking to the AR, the Court must determine whether a party has met its burden of proof based on the evidence in the record.  Id.

**Plaintiff Failed to Establish that CMS Violated FASA and the FAR By Including the Modified Payment Term in the RFQs**

CGI argues that CMS violated the Federal Acquisition Streamlining Act and FAR 12.301, 12.302, and 10.002 by including payment terms in the RFQs that are inconsistent with customary commercial practice without first conducting market research or obtaining a waiver.[18] CGI points to FASA's mandate that agencies use clauses "consistent with standard commercial practice," 41 U.S.C. §§ 3307(b), (e)(2)(B)(ii), which the FAR Council implemented "in FAR Part 12 (among other places)."  Pl.'s Mot. 15.  FAR 12.301(a)(2) provides that "contracts for the acquisition of commercial items shall, to the maximum extent practicable, include only those clauses [d]etermined to be consistent with customary commercial practice."  FAR 12.302(c) directs that the Government "shall not tailor any clause or otherwise include any additional terms or conditions in a solicitation or contract for commercial items in a manner that is inconsistent with customary commercial practice . . . unless a waiver is approved . . . ."  In order to request a waiver, an agency must draft a waiver request that "describe[s] the customary commercial practice."  To ascertain the customary commercial practice, the agency must first conduct market research in accordance with FAR 12.302(c) and 10.002(b).  See FAR 12.302(c)[19] and FAR 10.002(b).[20]

CGI's argument is contingent on the assumption that FAR Part 12 applies to Federal Supply Schedule purchases addressed in FAR Subpart 8.4.  FAR Part 12 governs the acquisition

---

[18]  At oral argument, Plaintiff's counsel explained that though FASA's language is directed to the FAR Council—not CMS—FAR Part 12 incorporates FASA and makes FASA applicable.  Tr. Oral Arg. 54-55, June 6, 2014.

[19]  FAR 12.302(c) states, in pertinent part: "The request for waiver must describe the customary commercial practice found in the marketplace, support the need to include a term or condition that is inconsistent with that practice and include a determination that use of the customary commercial practice is inconsistent with the needs of the Government."

[20]  FAR 10.002(b) states in pertinent part: "(1) . . . Market research involves obtaining information specific to the item being acquired and should include— . . . (iii) Customary practices, including warranty, buyer financing, discounts, contract type considering the nature and risk associated with the requirement, etc., under which commercial sales of the products or services are made."

of commercial items generally, and the parties agree that RAC services qualify as commercial items.  As such, the Court must determine whether FAR Part 12 applies to Schedule buys under FAR Subpart 8.4.

## Neither FAR Subpart 8.4 Nor FAR Part 12 Requires That Terms of RFQs for FSS Buys Comply with FAR Part 12 Procedures

CGI contends that because RAC services meet the FAR's definition of commercial items and the FAR states that Part 12 shall apply to acquisitions of commercial items, the agency was required to adhere to Part 12 in fashioning the RFQs.  The application of Part 12 would have required CMS to include in the RFQs only terms consistent with customary commercial practice or obtain a waiver, which CMS concedes it did not do here.  See FAR 12.302(c).

FAR Subpart 8.4 governs the Federal Supply Schedule which provides federal agencies with a simplified process for obtaining commercial supplies and services at prices associated with volume buying.  See FAR 8.402.  In Sharp Electronics Corporation v. McHugh, the Federal Circuit explained how the Federal Supply Schedule operates:

> Under the current version of the GSA Schedules Program, also called the Federal Supply Schedule Program or Multiple Award Schedule Program, [], GSA "acts as the contracting agent" for the federal government, negotiating base contracts with suppliers of commercial products and services. Each supplier publishes an Authorized Federal Supply Schedule Pricelist listing the items offered pursuant to its base contract, as well as the pricing, terms, and conditions applicable to each item. See FAR 8.402(b). Individual agencies issue purchase orders under the base contract as needed.  The terms of the base contract, referred to as the "schedule" contract, are incorporated by reference into the order. ... Schedule contracts are intended to simplify the acquisition process.

707 F.3d 1367, 1369-70 (Fed. Cir. 2013) (internal citations omitted); see also Tektel, Inc. v. United States, 116 Fed. Cl. 612, 614 (2013).

FAR Subpart 8.4 expressly lists FAR provisions that do and do not apply to the FSS, but does not list Part 12 in either category.  FAR Subpart 8.4 explicitly mentions Part 12 in three places.  First, Subpart 8.402 instructs agencies that they may add items not on the FSS—"open market items"—to Blanket Purchase Agreements ("BPA") or FSS orders, but "only if" the agency complies with "all applicable acquisition regulations pertaining to the purchase of the items not on the Federal Supply Schedule . . . (e.g., publicizing (Part 5), competition requirements (Part 6), *acquisition of commercial items (Part 12)*, contracting methods (Parts 13, 14, and 15), and small business programs (Part 19))."  FAR 8.402(f) (emphasis added).  Second, under Subpart 8.406-4, a termination for cause must comply with FAR 12.403."  Third, under Subpart 8.406-5 "[t]erminations for the Government's convenience must comply with FAR 12.403."  Thus, FAR Subpart 8.4 only provides that FAR Part 12 applies in three instances—termination for cause, termination for convenience, and adding open market items to FSS orders.  These instances in which FAR Part 12 applies are different species than a payment clause.

FAR 8.404 lists FAR sections that generally do not apply to FSS orders—FAR Parts 13, 14, 15, and 19—but does not include Part 12.  CGI contends that where Subpart 8.4 explicitly excludes and includes other provisions of the FAR, those mentioned provisions are "process oriented," e.g. negotiated procurements, sealed bidding, whereas Part 12 is policy, and is therefore generally applicable, whether expressly mentioned or not.  Tr. Oral Arg. 61, June 6, 2014.  This distinction between process-oriented provisions and policy is not persuasive in this context—all of these provisions have elements of policy and process—solicitation, evaluation, and award using sealed bidding, negotiations, or simplified acquisitions delineate processes that embody policy, as do the provisions of FAR Subpart 8.4 describing procedures to implement what is supposed to be a simplified acquisition process for Schedule buys.  More fundamentally, the notion that a court should apply regulations where they do not say they apply because they contain "policy" invites unwarranted judicial intrusion into the realm of regulation writing.  Whether FAR Part 12's requirements for customary commercial practices ought to be injected into a given procurement process is a matter for the FAR Council to determine, and the Council has not seen fit to add that requirement to FSS buys.

In a similar vein, FAR Part 12 itself does not expressly state its provisions apply to FSS buys.  In general, FAR Part 12 prescribes policies and procedures for the acquisition of commercial items.  It "implements the Federal Government's preference for the acquisition of commercial items . . . by establishing acquisition policies more closely resembling those of the commercial marketplace and encouraging the acquisition of commercial items and components."  FAR 12.000.  While Part 12 states that contracts for commercial items are also subject to policies and procedures found in other parts of the FAR, it does not mention Subpart 8.4 or the FSS in this acknowledgement.  FAR 12.102(c) ("Contracts for the acquisition of commercial items are subject to the policies in other parts of the FAR.").

FAR Part 12 only expressly mentions Subpart 8.4 or the Federal Supply schedule in three instances, which are of no help here.  These three references simply direct a contracting officer to follow procedures in subpart 8.4 when using the Federal Supply Schedule.[21]  Concomitantly FAR Part 12 lists five situations where Part 12 does <u>not</u> apply, but does not mention Schedule buys: "(1) At or below the micro-purchase threshold; (2) Using the Standard Form 44 (see 13.306); (3) Using the imprest fund (see 13.305); (4) Using the Government[-]wide commercial purchase card . . . ; or (5) Directly from another Federal agency."  <u>FAR 12.102(e).</u>

Other provisions of Part 12 indicate that its provisions have some applicability to different FAR sections, but fail to mention Subpart 8.4 or the FSS.  For example, FAR 12.203

---

[21] These references are in FAR 12.207, entitled "contract type."  The first reference to Subpart 8.4 is in "paragraph (b)" where it states "(3) When making a change that modifies the general scope of. . . (ii) An order issued under the Federal Supply Schedules, [the contracting officer must] follow the procedures at 8.405-6."  FAR 12.207(b)  The second reference, also in paragraph (b), cites FAR 8.404(h) "for the requirement for determination and findings when using Federal Supply Schedules."  <u>Id.</u>  Finally, the third reference in paragraph (c) explains when indefinite-delivery contracts may be used, and states that "[p]lacement of orders shall be in accordance with Subpart 8.4 or 16.5, as applicable."  FAR 12.207(c)(2).

directs contracting officers to use the policies in Part 12 "in conjunction with the policies and procedures for solicitation, evaluation and award prescribed in [P]art 13, Simplified Acquisition Procedures; [P]art 14, Sealed Bidding; or [P]art 15, Contracting by Negotiation, as appropriate for the particular acquisition."  FAR 12.203.

In interpreting these regulations, the Court follows the long-established principle of *expressio unius est exclusio alterius*—the express mention of one thing excludes all others.  See e.g., Slattery v. United States, 635 F.3d 1298, 1323 (Fed. Cir. 2011) ("As a textual matter, the amendment applies only to the enumerated entities in light of the canon *expressio unius est exclusio alterius*") (citing Tenn. Valley Auth. v. Hill, 437 U.S. 153, 188 (1978)).  Both FAR Subpart 8.4 and FAR Part 12 expressly list other instances or types of acquisitions where FAR Part 12 applies, but neither mentions the scenario at issue here—payment terms in an FSS purchase.  Under maxim *expressio unius est exclusio alterius*, this Court finds that FAR Part 12 does not apply to the payment term in the RFQs issued under CGI's FSS contract.  There is no basis to refrain from applying this maxim here because there is no intent expressed in either FAR Subpart 8.4 or FAR Part 12 suggesting that customary commercial payment terms ought to apply to FSS orders.  Cf. Andrus v. Glover Constr., 446 U.S. 608, 619 (1980) (quoting DeCoteau v. District County Court, 420 U.S. 425, 447 (1985) ("[a] canon of construction is not a license to disregard clear expressions of . . . congressional intent.").

CGI also invokes FAR 12.102(c) which provides that "[w]hen a policy in another part of the FAR is inconsistent with a policy in this part, this [P]art 12 shall take precedence for the acquisition of commercial items."  FAR 12.102(c).  CGI contends that because Part 12 applies to the acquisition of commercial items and requires contracts to contain terms consistent with customary commercial practice absent a waiver, then Part 12 conflicts with Subpart 8.4 and, consequently, Part 12 prevails.  Pl.'s Mot. 15.  Plaintiff, however, relies only on FAR Subpart 8.4's silence and has failed to identify an actual conflict between the provisions of FAR Subpart 8.4 and the provisions of FAR 12.  As explained above, Part 12 delineates the type of commercial item acquisitions to which it applies and does not include RFQs issued under FSS contracts.

Plaintiff also suggests that failing to apply FAR Part 12 at the FSS order level would lead to an anomalous result where the terms of the FSS contract would meet FAR Part 12 but the order placed under that contract would not.  That is not the situation before this Court, however.  CGI could have avoided this anomalous result by listing, as part of its Schedule Contract, "the items offered pursuant to its base contract, as well as the pricing, terms, and conditions applicable to each item" as required by FAR 8.402(b) (emphasis added).  See also, Sharp Elec. Corp., 707 F.3d at 1369-70.  Orders made through the FSS, FAR Subpart 8.4, must be consistent with the schedule contract.  FAR 8.406-1(c).  CGI's "pricelist," or price terms on its schedule contract listed a contingency fee of up to 19.55%, but stated that payment terms would be "negotiated at the order level."  Def.'s Mot. App. 25.[22]  CGI's Schedule itself said nothing about payment terms including when invoicing could be done, leaving room for the agency to insert a payment term in its RFQ that was not inconsistent with CGI's FSS contract, but problematic for CGI nonetheless.  Id.

---

[22] The record does not indicate why this language appeared in CGI's Pricelist.

**The RFQ's Payment Terms Do Not Unduly Restrict Competition**

CGI contends that RFQs' payment terms unduly restrict competition by requiring RACs to wait 120 days to 420 days to invoice, thereby causing them to absorb high accounts receivable and ultimately forcing incumbent RACs to refrain from bidding on the instant RFQs. Pl.'s Mot. 28 (citing AR Tab 32 at 1293-94 ¶ 12-14). CGI points out that the Government received seven quotes in response to the 2013 RFQ that did not contain restrictive payment terms, but only four quotes in response to the January 2014 RFQ containing the restrictive terms. Pl.'s Opp'n 21; Tr. Oral. Arg. 53-54, June 6, 2014.

CGI has not demonstrated that the payment terms "actually 'restricted competition'" as all incumbent RACs, except CGI, submitted quotes for the RFQ and the record does not establish that the payment terms were the cause of any other RACs failing to bid. Def.'s Mot. 35-36. PRGX, a RAC, made the following public statement on withdrawing its quote:

> 2013 was especially difficult due to changes in audit scope in the Medicare RAC program and significant delays in the rebid process, resulting in disappointing financial results for the year. As previously disclosed, we expect a difficult 2014 in this business due to continued delays in the CMS rebid process and unprofitable changes in the scope of the current subcontracts. Given the uncertain audit scope and challenging business terms as defined in the Medicare RAC rebid RFP and the ongoing pressure from the provider community to limit scope in the future, we simply believe that entering into a new Medicare RAC contract presents unacceptable level of financial risk for PRGX. Thus we have decided to dropout of the CMS rebid process and focus our future growth efforts in other areas.

AR Tab 41 at 1337.

CGI contends that the "challenging business terms" referenced in the above quote are the restrictive payment terms. However, as the Government emphasizes, the unexplained "challenging business terms" are only one of several reasons PRGX withdrew as delineated in its public statement. Based on its own words, a primary source of PRGX's withdrawal was a more limited audit scope. As Plaintiff's counsel acknowledged, "there's a Congressional moratorium on about 90% of the work that's being done under the RAC contracts until March of 2015." Tr. Oral Arg. 74, June 6, 2014.

While CGI's withdrawal indicates the payment terms caused some restriction in competition, CGI has not demonstrated this term "unduly" restricted competition. As the GAO found in Impact Resource Technologies, competition was not unduly restricted where a protestor challenged terms of an RFQ as unduly restrictive, but the agency received four other responsive quotations. See Impact Res. Techs., B-407259.2, 2012 CPD ¶ 335, 2012 WL 6035676, at *2 (Comp. Gen. Dec. 4, 2012).

**Plaintiff Has Not Demonstrated that the Agency's Inclusion of Payment Terms Inconsistent with Customary Commercial Practice was Arbitrary, Capricious, An Abuse Of Discretion, Or Otherwise Not In Accordance With Law**

CGI also alleges that the modified payment term is arbitrary and capricious and lacks a rational basis because it is an unnecessary "solution in search of a problem" and a "belt and suspenders" approach for ensuring the Government can recoup contingency fees on overpayments that were misidentified. While CGI's argument rings true in many respects and the modified payment term here will increase cost, reduce competition, and appears to be a bit excessive, it does not rise to the level of arbitrary and capricious conduct lacking a rational basis.

This Court may set aside an agency's procurement decision if "either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa, 238 F.3d at 1332. The Federal Circuit has explained that "[w]hen a challenge is brought on the first ground ... contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." Id. at 1332-33 (citing Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." In re Sang-Su Lee, 277 F.3d 1338, 1344 (Fed. Cir. 2002) (quotation marks omitted) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43). Here, the agency examined relevant data, considered several options, articulated a basis for its decision, did not violate statute or regulation or unfairly disadvantage any bidder or class of bidders.

The modification of the payment term was in essence a judgment call by agency officials from CMS' procurement, financial, and legal departments. What concerned the agency was that there would be no contractual vehicle to demand a contingency fee payment back if an overpayment determination were overturned on appeal after a RAC contract ended. Previously CMS had simply deducted from future payments any contingency fees the RAC owed CMS for misidentifying the overpayment. As the agency recognized, when the RAC contract ends, CMS will no longer be regularly paying the RAC and will be unable to deduct the contingency fees owed by RACs. The agency decided that it was preferable to wait to pay the contingency fees and thus keep money in the Government's possession, rather than turning it over to the RACs, until it appeared more likely that the contingency fee had been properly earned and an overpayment correctly identified. The agency determined that there would be sufficient benefit in structuring its program this way because of its "concern that the RACs really should not be paid until it is determined that the recoupment is deemed legitimate and appropriate." AR Tab 94 at 8603. The agency considered various options it characterized as surety bond, withholding, trust fund, escrow, progress payments, letter of credit, financial rewards, letter of assurance from parent company, and reserve. Ultimately, CMS exercised its discretion to modify the payment term as well as to require a reserve and letter of assurance, knowing full well the RACs' concerns with the term and the costs and benefits involved. AR Tab 59 at 2000.

The record demonstrates that CMS knew that the RACs were not "happy [with the terms] because it will increase the time period in which they will get paid." AR Tab 94 at 8607.3. Before CMS issued the RFQs at issue, it attempted to include the contested payment terms in a

contract modification with the RACs, but none of the performing RACs agreed to that modification *in toto*, and most expressed concern about their ability to financially tolerate the delayed invoicing requirements.  One contractor, HDI, related to CMS that it anticipated the new delayed invoicing terms would cost it more than $[          ] per/year. AR Tab 161 at 10530.  Similarly, Performant objected to the "unilateral changes to material contract terms" and contended that it would have a "negative impact on the RAC's financial capacity."  Id. at 10900.  HDI sent CMS a list of concerns including that the terms would bring the RAC's "cash flow and revenue recognition []to a halt," then CMS attached this list of concerns to an email CMS sent to all RACs and some CMS employees.  Id. at 10529-30, 10539-40.

Although, before issuing the RFQs, CMS was aware that the RACs objected to these delayed invoicing payment terms and contended that their services would cost more, the agency determined that a countervailing consideration won the day—that the agency was unwilling to take on the risk of not being able to recoup contingency fees once the contract ended.  This was not arbitrary, capricious, or irrational.  The decision did not violate statute or regulation or result in an uneven playing field—all prospective bidders were equally disadvantaged.  Nor was the curtailment of competition significant.  The Court would thus be overstepping its bounds to substitute its judgment for that of the agency in determining its needs, particularly in the financial realm.

As this Court recognized in Communication Construction Services, Inc. v. United States, procurement officials possess substantial discretion in financial judgments regarding agency needs because they will live with the consequences of its determination.  116 Fed. Cl. 233, 268, 272 (2014).  Here, the agency devised the modified payment term knowing its cost and benefit to the Government and adverse impact on bidders and was willing to impose this requirement as a solution to its needs.  This was in essence a financial judgment call that this Court should not second guess.[23]

### Conclusion

The Court **DENIES** the Government's motion to dismiss for lack of standing.

The Court **DENIES** Plaintiff's motion for judgment on the Administrative Record and **GRANTS** the Government's motion for judgment on the Administrative Record.  Plaintiff's

---

[23] This case does provide, however, a troubling example of what are supposed to be FSS simplified acquisitions being used to purchase multi-million dollar, multi-year, complicated services, such as for Recovery Audit Contractors.  Procurements such as these illustrate how FSS buys have expanded into the territory formerly occupied by negotiated procurements.  See John Cibinic & Ralph C. Nash, Contracting Methods: Square Pegs and Round Holes, 15 Nash and Cibinic Rep. 9 ¶ 48 (2001) (citation omitted) ("Use of the FSS to acquire services [such as $344 million in services over 60 months] . . . hardly seems to be what Congress expected when it granted statutory status to multiple award schedules.").

motion for injunctive relief is **DENIED**.   The Court directs the Clerk to enter judgment accordingly.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**